Hillsborough
No. 84-343

### THE STATE OF NEW HAMPSHIRE

v.

### DAVID MERCIER

May 9, 1986

58

*Stephen E. Merrill*, attorney general (*Gregory W. Swope*, assistant attorney general, on the brief and orally), for the State.

*Schapira and Green P.A.*, of Manchester (*Andru H. Volinsky* on the brief and orally), for the defendant.

SOUTER, J. The Superior Court (*DiClerico*, J.) committed the defendant to New Hampshire Hospital under RSA 651:9 (current version at RSA 651:9-a (Supp. 1985)), on the ground that it would be dangerous for him to "go at large." In this appeal, the defendant raises four claims of error: (1) that the court ordered his post-trial psychiatric evaluation without legal authority; (2) that the order violated his privilege against compulsory self-incrimination, as guaranteed by the State and National Constitutions; (3) that the procedure followed and the standards employed in determining his dangerousness denied him equal protection of the laws, as guaranteed by each constitution; and (4) that the evidence was insufficient to justify the commitment. We find no merit in these claims and sustain the order of commitment.

On October 7, 1983, a jury found the defendant guilty of two counts of robbery, whereupon the defense of insanity was submitted to the same jury under the bifurcated trial procedure authorized by *Novosel v. Helgemoe*, 118 N.H. 115, 123–25, 384 A.2d 124, 128–30 (1978). On the basis of the evidence submitted at the first segment of the trial, the jury returned verdicts of not guilty by reason of insanity.

The trial court then scheduled a hearing to determine whether the defendant should be released or should be committed to New Hampshire Hospital as a person who would be dangerous if allowed to go at large. RSA 651:9 (current version at RSA 651:9-a (Supp. 1985)). The defendant proposed to offer no further evidence on the issue of his future dangerousness, and he indicated that he would rely on the testimony of Dr. Sheldon Zigelbaum, who had given evidence on the issue of intent during the first segment of the trial. Dr. Zigelbaum had testified that the defendant suffered from a series of psychiatric disorders including depression, anxiety, and post-traumatic stress disorder, all of which were exacerbated by alcohol abuse and an "organic disability."

The State had offered no expert testimony on the defendant's mental condition at either segment of the trial, and had obtained no professional opinion on the defendant's future dangerousness. In order to obtain such an opinion for introduction at the commitment hearing, the prosecution sought an order requiring the defendant's examination by a doctor to be chosen by the State. The court so ordered, subject to objection, and the defendant submitted unwillingly to an examination by Dr. Albert Drukteinis. The latter did not contradict Dr. Zigelbaum's diagnosis, but supplemented it with his own opinion that the defendant suffered from an antisocial personality disorder, which combined with poor impulse control to render him dangerous even without the stimulus of specific stress.

After considering this testimony, the trial court found that the defendant would be dangerous if allowed to go at large and committed him to the New Hampshire Hospital for the maximum initial period of five years. RSA 651:9 (current version at RSA 651:9-a (Supp. 1985)), RSA 651:11-a, I (Supp. 1985). This appeal followed.

■■ The defendant first claims that the court lacked any legal authority to require him to submit to an examination by Dr. Drukteinis. Although he correctly points out that the court has no express statutory authority to require a post-trial examination, *cf.* RSA 135:17 (Supp. 1985), his challenge ignores the rule that the creation of a statutory duty carries with it the power to discharge the responsibility so imposed. 2A. SUTHERLAND STAT. CONST. § 55.04 (C. Sands 4th ed. rev. 1984); *see Whitney v. Watson*, 85 N.H. 238, 242, 157 A. 78, 81 (1931). In *State v. Kupchun*, 117 N.H. 412, 373 A.2d 1325 (1977), for example, we recognized that the superior court's responsibility to determine whether the commitment of a criminally insane defendant should be renewed and extended beyond its original term carried with it the power to obtain access to the only recent evidence bearing on the issue of dangerousness. Accordingly, we held that the

court was authorized to grant access to otherwise privileged medical and psychiatric records compiled during the original commitment period.

> "In order to perform [its] mandated duties, it is essential that the superior court be presented with the best information available which has a bearing on defendant's dangerousness or mental condition. Without access to the evidence ordered by the trial court in this case, the state would be virtually deprived of the opportunity to present to the superior court the evidence it must have to properly decide whether the defendant's stay in the hospital should be continued."

*Id.* at 415–16, 373 A.2d at 1327. The principle on which we limited the scope of the physician-patient and psychologist-client privileges in *Kupchun* entails the conclusion that the superior court has the authority to order the examination at issue here.

The defendant's second challenge to the examination order characterizes it as a violation of his privilege against compulsory self-incrimination, as guaranteed both by part I, article 15 of the Constitution of New Hampshire and by the fifth amendment of the National Constitution made applicable to the States by the fourteenth amendment. As is our custom, we consider the claim under the State Constitution first, *see State v. Ball*, 124 N.H. 226, 231, 471 A.2d 347, 350 (1983), relying on interpretations of the federal counterpart only for guidance in making an independent State analysis. *See Michigan v. Long*, 103 S. Ct. 3469, 3475–76 (1983).

The defendant raised this claim without reference to any particular questions that might be asked or to any specific subjects that might be covered by the doctor's examination, and we therefore understand his position to be that the examination order was a *per se* violation of the privilege claimed. In considering this position, it is essential to recognize that the court issued the examination order in the course of a dispositional proceeding, following a verdict of not guilty by reason of insanity. The insanity verdict had precluded any possibility of imposing criminal liability for the acts charged in the indictment, *Novosel v. Helgemoe*, 118 N.H. at 122–24, 384 A.2d at 128–29, and the only issue in the pending proceeding that could then have been affected by the defendant's statements was the appropriateness of either releasing him or committing him on grounds of dangerousness. That same issue is raised in a civil proceeding for commitment initiated under RSA 135-B:28, on the ground that the respondent's mental illness creates a likelihood of danger within the meaning of RSA 135-B:26. *See State v. Paradis*, 123 N.H. 68, 70, 455

A.2d 1070, 1072 (1983). The issue in either case is the need for protection, not the appropriateness of punishment. *See* RSA 135-B:26; *see also State v. Ballou*, 125 N.H. 304, 317–18, 481 A.2d 260, 267–68 (1984) (Souter, J., dissenting in part).

■ This procedural analysis indicates that the purpose of such an examination order is not to elicit statements for the purposes of convicting or punishing a defendant. There is, therefore, no incriminating objective or consequence necessarily inherent in such an order, and compelling an examination cannot be regarded as somehow the equivalent of compelling self-incrimination. *See In re Field*, 120 N.H. 206, 210–11, 412 A.2d 1032, 1035 (1980). Hence, an order such as the one in question is not a *per se* violation of article 15, and the defendant's objection was properly overruled.

■■ It does not follow, of course, that the nature of the proceeding necessarily precludes the assertion of the privilege. The privilege depends upon the incriminating tendency of a compelled testimonial statement, not upon the forum or proceeding in which the statement may be elicited. *In re Gault*, 387 U.S. 1, 49 (1967); *see In re Field supra*. An examination of the sort in question here could not, therefore, be required merely as a subterfuge to obtain evidence of criminal conduct as the basis for other charges. *See In re Field supra*. Even in the absence of any such subterfuge, we must take care to recognize that a particular question in the course of a required examination could call for an answer incriminating the defendant in another offense.

■■ The defendant does not claim that any such question or answer occurred during his examination, and thus it is sufficient to note that in such circumstances a defendant who has not waived his article 15 rights will be entitled to protection. *See In re Fay G.*, 120 N.H. 153, 155, 412 A.2d 1012, 1015 (1980). In the first instance, a defendant may invoke the privilege against answering a question that calls for an incriminating response, *see Sevigny v. Burns*, 108 N.H. 95, 97, 227 A.2d 775, 777 (1967), although this opportunity will usually be more theoretical than practical in the absence of counsel. *See In re Field, supra* at 209–10, 412 A.2d at 1034. More practically, in any later criminal proceeding a court may exclude evidence if its use would violate the article 15 privilege. *Id.* at 211, 412 A.2d at 1035.

■ When we apply the fifth and fourteenth amendments to the order in question, the result is the same. Although the defendant relies upon *Estelle v. Smith*, 451 U.S. 454 (1981), that case does not support his position. In the absence of a fifth amendment waiver,

*Estelle* required the exclusion of testimonial evidence elicited from a homicide defendant during a pretrial psychological examination, when the prosecution offered that evidence for the purpose of determining the severity of punishment upon conviction. *Id.* at 462–63. In *Estelle*, the evidence in question happened to bear on the issue of the defendant's future dangerousness because, under the local law involved, dangerousness was relevant in determining whether the death penalty was appropriate. But *Estelle* did not hold that the fifth amendment would be implicated by an order directed to elicit testimonial evidence bearing on purely protective, non-punitive commitment. The Court indeed expressly distinguished the use of the evidence then before it from the use of psychiatric testimony based on the examination of a defendant who had pleaded insanity. *Id.* at 465. Thus, it is clear from *Estelle* that compelled psychological examinations do not *per se* violate fifth amendment principles, and it is equally clear that the non-incriminating use of testimonial evidence derived from the examination in question here removes this case from the ambit of *Estelle's* prohibition. The court's order, and the use of evidence obtained as a result of it, did not violate the fifth and fourteenth amendments.

The defendant's next challenge to the examination order and to the ensuing determination of dangerousness is predicated on standards of equal protection guaranteed by both the State and National Constitutions. Although the defendant's various arguments compare his position to that of a respondent in a purely civil commitment proceeding, he does not claim the law mandates a denial of equal protection by providing different standards for civil and criminal commitments. Rather, he argues in his brief that the trial court misapplied the appropriate standards to his prejudice, and that the misapplication denied him equal protection: "at the urging of the prosecutor, the trial court treated [the defendant] substantially different than a person subject to an involuntary civil commitment. The differences were primarily that the State made no showing of a sufficiently recent act and made no showing whatsoever of the unavailability of less restrictive treatment modalities." (Footnote omitted.)

We should say initially that if the defendant were correct we would face a claim of pure legal error, not an equal protection claim. On his theory, if the trial court had not committed legal error, the defendant would have suffered no prejudice, and if the errors are corrected no constitutional violation will be left. We, however, find no legal error, and hence we go on to consider whether the standards applicable to commitment support the defendant's claims of equal protection violations. We conclude that they do not.

■ When the defendant argues, first, that the court failed to require proof of a "sufficiently recent act," he alludes to the terms of RSA 135-B:26 and :28, governing civil commitments, which require proof of an act or acts manifesting dangerousness. In applying these provisions in cases of initial civil commitment, we have simply held that the act so proven must be "sufficiently recent" to have evidentiary value in satisfying the State's burden to prove dangerousness. *Proctor v. Butler*, 117 N.H. 927, 935, 380 A.2d 673, 678 (1977); *see State v. Hudson*, 119 N.H. 963, 967, 409 A.2d 1349, 1351 (1979). The "sufficiently recent act" in civil commitment proceedings need not be enough, standing alone, to prove future dangerousness, and thus it is stating the obvious to say that what is "sufficiently recent" will depend on the nature and circumstances of the act, the history of the person in question and the probative force of the other evidence adduced to prove dangerous propensity.

■ In a criminal case, when there is an initial commitment proceeding under RSA 651:9 (current version at RSA 651:9-a (Supp. 1985)) following a verdict or plea of insanity, the requirements for predicting dangerousness are in practice the same as those just described (and at the time of this commitment the burden of proof was the same, *see Proctor v. Butler, supra* at 935, 380 A.2d at 1351; N.H. CONST. pt. I, art. 15, amended 1984). The verdict or plea indicates that the defendant committed the acts charged in the complaint or indictment, and in practice the criminal speedy trial requirements will guarantee that such acts will be "sufficiently recent" to have probative value. Indeed, an act may be "sufficiently recent" for purposes of civil commitment even when trial of an indictment charging that act would offend speedy trial standards. *See State v. Hudson supra.* It follows as a practical matter that timely prosecution will guarantee that any act charged by criminal process will be sufficiently recent to have probative value in determining whether the defendant is and will be dangerous.

■ In *Hudson*, for example, we stated that proceedings for civil commitment could be initiated on the basis of an act that had allegedly been performed thirty-five months before. *State v. Hudson*, 119 N.H. at 967, 409 A.2d at 1351–52. In the present case, the act charged was committed sixteen months before the commitment. This comparison belies any claim of an equal protection violation prejudicial to the defendant.

■ The defendant's second equal protection argument has no greater force than the first. In claiming that the State failed to prove that his condition could not be dealt with less restrictively, the

defendant alludes to RSA 135-B:32, V, which requires that an examining psychiatrist in a civil case describe to the court any less restrictive alternatives that he considered before recommending commitment. We have construed this requirement as mandating testimony as part of satisfying the State's "burden of going forward" with evidence in civil cases, *Proctor v. Butler*, 117 N.H. at 935, 380 A.2d at 678, but have held that the possibility of less restrictive alternative means of dealing with dangerousness need not be eliminated beyond a reasonable doubt before a court may properly order a civil commitment. *Id.* That is, the elimination of less restrictive alternatives is a subject of required evidentiary fact, but it is not a necessary element in satisfying the burden of proof to justify civil commitment.

██ ██ What is significant for equal protection purposes is that no one may be committed on either civil or criminal process unless commitment is shown to be necessary to protect the person or the public from dangerousness caused by mental illness. RSA 135-B:26; RSA 651:9 (current version at RSA 651:9-a (Supp. 1985)); *see Novosel v. Helgemoe*, 118 N.H. at 122, 384 A.2d at 128; *Proctor v. Butler*, 117 N.H. at 935, 380 A.2d at 678. We therefore find no colorable equal protection claim inherent in the statutory differences between civil and criminal commitment proceedings, or raised in fact by the lack of express testimony about less restrictive alternatives in this case.

██ The defendant argues finally that there was insufficient evidence of his dangerousness to justify commitment. On the one hand he emphasizes the undisputed difficulty in predicting future behavior, an issue that this court has long since confronted in holding that the difficulty does not equate to impossibility. *See Proctor v. Butler*, 117 N.H. at 934, 380 A.2d at 677. On the other hand, he argues that the evidence failed to establish a "substantial" mental impairment in the form of a "major" mental illness. Without turning this into an issue of words, it is enough to say that a rational trier of fact could have found dangerousness beyond a reasonable doubt on the basis of the evidentiary facts before the court: the defendant had a history of violent acts of robbery; coincidentally with this history he suffered from antisocial personality disorder, chronic depression disorder, generalized anxiety disorder, post-traumatic stress disorder, and the effects of substance abuse; his clinical prognosis was poor. *See State v. Paradis*, 123 N.H. 68, 72, 455 A.2d 1070, 1073 (1983). The trial court's conclusion is not open to serious question.

*Affirmed.*

All concurred.